**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| JANE DOE, | : | | |
| | : | | |
| *Plaintiff*, | : | Civil Action No.: | 22-3474 (RC) |
| | : | | |
| v. | : | Re Document No.: | 18 |
| | : | | |
| LLOYD AUSTIN, III, | : | | |
| Secretary of Defense, | : | | |
| | : | | |
| *Defendant*. | : | | |

## MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART DEFENDANT'S PARTIAL MOTION TO DISMISS

### I. INTRODUCTION

Plaintiff Jane Doe ("Plaintiff"), proceeding under pseudonym, brings an employment discrimination action under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 against Defendant Lloyd Austin in his official capacity as Secretary of Defense ("Defendant"). Plaintiff largely proceeds under Title VII of the Civil Rights Act of 1964, alleging that she suffered disparate treatment and a hostile work environment based on her race and national origin, and that she suffered retaliation for reporting this discrimination. Plaintiff also alleges that her due process rights were violated when she was not given an opportunity to participate in the reconsideration of the revocation of her security clearance. Defendant has filed a partial motion to dismiss for failure to state a claim, arguing that Plaintiff's hostile work environment and due process claims should be dismissed in full, and that her disparate treatment claim should be dismissed in part because Plaintiff fails Title VII's administrative exhaustion requirement and because some of the actions at issue are not sufficient adverse actions to state a claim. For the reasons stated below, the partial motion to dismiss is granted in part and denied in part.

## II.  BACKGROUND

### A.  Factual Background[1]

Plaintiff alleges that she is a Chinese American who was employed as an intelligence officer for the Defense Intelligence Agency.  First Am. Compl. ("Am. Compl.") ¶ 2, ECF No. 16. Plaintiff is an American citizen; she previously held United Kingdom citizenship, but abandoned it when she was naturalized as a U.S. citizen.  *Id.* ¶ 25.  She was hired as an intern on March 28, 2011, and then in June 2011, she was offered full-time employment with the Agency.  *Id.* ¶ 13. In November 2011, Plaintiff took a vacation to Jamaica, which was authorized and approved by her supervisors.  *Id.* ¶ 14.  While there, she participated in the Miss United Nations Pageant.  *Id.* ¶ 16.  Because Plaintiff was a late entrant and the representative for the United States had already been chosen, "[t]he pageant organizers recommended that she participate as Miss China." *Id.* ¶ 15.  Plaintiff participated as Miss China "based on her heritage, not her nationality[.]" *Id.* ¶ 16.  The previous year's Miss China was also an American citizen.  *Id.* ¶ 15.  Plaintiff did not win the competition or receive any money as part of her participation.  *Id.* ¶ 16.

Two days after Plaintiff returned from Jamaica, Krisanne Lindenauer, an Agency security official, interrogated Plaintiff about her trip and her reasons for entering the defense industry.  *Id.* ¶ 17.  Ms. Lindenauer asked Plaintiff to take a polygraph examination, and Plaintiff agreed.  *Id.* ¶¶ 17–18.  During the examination, Plaintiff reported going to Jamaica on vacation, but she "did not mention the pageant for fear that she would be objectified in the workplace." *Id.* ¶ 18.

In the next 10 days, Agency security officials held two more meetings with Plaintiff.  *Id.* ¶ 19.  They instructed Plaintiff to provide an updated list of her foreign contacts, including social

---

[1] Because the Court is resolving a motion to dismiss, it recounts the facts as pled in the amended complaint and assumes them to be true.  *See Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000).

media contacts.  *Id.* ¶¶ 20–21.  Plaintiff alleges that the Agency did not implement guidelines for reporting social media contacts until 2014, and not all employees were required to disclose their contacts.  *Id.* ¶¶ 20–21.  She alleges that the Agency did not ask her Caucasian colleagues "who attended the same study abroad program [as Plaintiff] at the Hopkins-Nanjing Center" to report their foreign social media contacts.  *Id.* ¶ 21.

After these three meetings, Plaintiff sought out "Ms. Lindenauer and informed her of the pageant and her participation as Miss China[.]"  *Id.* ¶ 22.  Ms. Lindenauer "angrily" chastised Plaintiff for her participation and demanded that Plaintiff write a statement of allegiance to the United States.  *Id.* ¶ 23.  The Agency allegedly only required employees with dual citizenship to write statements of allegiance, and Plaintiff was solely an American citizen.  *Id.* ¶ 25.  Plaintiff alleges that she was targeted based on her Chinese ancestry as "part of a pattern of discriminatory, hostile and xenophobic actions by Defendant's employees that specifically held Asian and Asian Heritage Americans to different standards than their White counterparts."  *Id.* ¶ 24.  Plaintiff's supervisors and colleagues stated that they were concerned about the statement of allegiance and expressed they felt Plaintiff's "race and national origin were a factor in the discriminatory nature by which it was mandated."  *Id.* ¶ 27.  Nonetheless, they told Plaintiff she would have to sign it to keep her employment.  *Id.*  Plaintiff wrote and signed the statement of allegiance on December 7, 2011.  *Id.* ¶ 28.

And although the timeline in the amended complaint is not exactly clear, it also appears that around this time, Plaintiff was directed "to cease all contact with foreign nationals when no such policy existed" at the Agency.[2]  *Id.* ¶ 51.  The Agency also told Plaintiff "that an HSBC

---

[2] The amended complaint introduces these allegations many paragraphs after it discusses the events of late 2011 and does not specifically identify when they occurred.  The allegations in paragraph 50 match the allegations in paragraphs 20 and 21.  *See* Am. Compl. ¶¶ 20–21, 50.  It

bank account that she had opened in California and closed in April 2009 was a security concern." *Id.* ¶ 52.  None of her Caucasian classmates from the Hopkins-Nanjing Center, who shared identical foreign contacts developed from that experience, and "who had bank accounts opened in the United States with multinational financial institutions," faced the same treatment.  *Id.* ¶¶ 51–52.

The amended complaint alleges that the Agency continued to subject Plaintiff to harassment and discrimination in spring of 2012.  *Id.* ¶ 29.  On April 4, 2012, she was summoned to another meeting with security officials and questioned about her partner, who was also a Chinese American employee of the Agency.  *Id.* ¶ 30.  The security officials told Plaintiff that her partner was also under investigation, and that her classmates in a specialized training course had reported Plaintiff as suspicious for arriving at an evening social gathering with other Asian Americans.  *Id.* ¶ 30–31.  On April 6, 2012, Plaintiff's partner posted a topic on the Defense Intelligence Agency's online discussion board outlining discrimination and retaliation against the Agency's Asian American and Middle Eastern employees.  *Id.* ¶ 32.  That same day, Plaintiff was called into another meeting with security officials and ordered to sign a second sworn statement.  *Id.* ¶ 33.

On April 25, 2012, Plaintiff and her partner filed an informal discrimination complaint with the Agency's Equal Employment Office ("EEO").  *Id.* ¶ 34.  The following month, a senior level EEO counselor requested that Plaintiff identify the party responsible for discrimination.  *Id.* ¶ 36.  Plaintiff gave the name of Ms. Lindenauer, who had been present at all seven of the

---

also makes sense if Plaintiff was ordered to cease contact with foreign nationals at around the same time that she was forced to provide her foreign social media contacts, and this group of allegations again references Plaintiff's time at the Hopkins-Nanjing Center.  *See id.* ¶¶ 50–51.

security meetings over the preceding seven months.  *Id.*  The EEO counselor interviewed Ms. Lindenauer.  *Id.* ¶ 37.

The next day, "in direct retaliation for being identified as the responsible party in the EEO investigation," Ms. Lindenauer directed Plaintiff to take another polygraph.  *Id.*  Plaintiff reported the demand to the EEO counselor and her managers, and her managers recommended she comply.  *Id.* ¶ 38.  With Ms. Lindenauer present, Plaintiff sat for and passed a six-hour polygraph at an off-site location.  *Id.* ¶ 40.  Two days later, she was also required to sit for an additional "grueling and aggressive" counter-intelligence polygraph.  *Id.* ¶ 41.

On June 28, 2012, Plaintiff participated in an Agency investigation into the treatment of its Asian American and Arab American employees.  *Id.* ¶ 42.  On July 2, 2012, the Agency Inspector General briefed senior management on the investigation, and that same day, the Agency's Chief of Staff sent an email to the Director, Deputy Director and General Counsel that recommended the Agency re-adjudicate Plaintiff's security clearance.  *Id.* ¶¶ 43–44.  A few days later, the Deputy Director initiated a Counterintelligence Risk Assessment on Plaintiff, allegedly "predicated on knowingly false reports against Plaintiff, motivated by her race, national origin, and protected EEO activity."  *Id.* ¶¶ 45–46.

Plaintiff alleges that an October 2012 preliminary assessment of the Agency's Inspector General investigation into discrimination stated that "two investigators['s] … behavior was not conducive to good order and discipline expected of a government employee" when they referred to an Asian American employee as a "house boy" and "intern bitch," and spread a photo of an Asian male sitting under a target with the caption "[Asian American colleague] demonstrates his potential at the [Agency] pistol range."[3]  *Id.* ¶ 48.  When Ms. Lindenauer was interviewed during

---

[3] It appears Ms. Lindenauer was one of these two investigators, but the other is unnamed.

the investigation, she was asked "[w]hat can be done to reduce/eliminate the perception of harassing or discriminatory practices?" and replied, "[n]othing, maybe they [Asian / Chinese Americans] should not be working in the IC [Intelligence Community]." *Id.* ¶ 47. Ms. Lindenauer also confirmed that she had referred to an Asian American colleague as her "house boy." *Id.* The amended complaint does not indicate that Plaintiff personally witnessed any of this conduct. Nonetheless, Plaintiff also "learned from the [Office of the Inspector General] investigation that Defendant's officials stated explicitly that she was being treated as she was because of her race and national origin." *Id.* ¶ 53.

On January 23, 2013, Defendant "cancelled [Plaintiff's] scheduled deployment abruptly without warning or explanation." *Id.* ¶ 55. She "would learn in subsequent years that the polygraph examinations that she passed with no reportable information were used by Defendant as a pretext" for her canceled deployment. *Id.* She requested to meet with the EEO office to report the cancellation as retaliatory and discriminatory but the meeting was never arranged. *Id.* ¶ 56. Plaintiff's partner requested a meeting with the Agency's Director, Michael Flynn, to discuss the deployment cancellation, but this meeting also did not occur. *Id.* One week later, "in another act of retaliation," Defendant placed Plaintiff and her partner on administrative leave without duties for 21 months. *Id.*

On September 11, 2023, Plaintiff received a Notice of Proposed Indefinite Suspension, and her security clearance was revoked on October 23, 2013. *Id.* ¶¶ 59–60. The revocation letter cited foreign influence and a "well-documented pattern of questionable personal conduct over the years" as reasons for the revocation. *Id.* ¶¶ 60–61. On March 5, 2014, Plaintiff contacted the EEOC about the status of her case. *Id.* ¶ 62. Five days later, in another alleged act of retaliation, Defendant issued Plaintiff a "Notice of Proposed Removal," before ultimately removing Plaintiff

from federal service on October 15, 2014.  *Id.* ¶¶ 62–63.  Plaintiff alleges that Defendant has

continued to "interfer[e] with her employment prospects as well as her ability to obtain a security

clearance for the last 10 years."  *Id.* ¶ 64.

Finally, Plaintiff alleges that on February 24, 2023, she received a notice dated January

13, 2023 that "a request for reconsideration of the revocation of her security clearance had been

denied."  *Id.* ¶ 65.  Prior to receiving this notice, Plaintiff was "never made [] aware that the

revocation of her security clearance was under reconsideration" and "never afforded Plaintiff an

opportunity to participate in that process whatsoever."  *Id.* ¶ 66. Plaintiff also states that she has

received "four notices of separation from the U.S. Army under the pretense of a lack of a

security clearance."  *Id.*  She alleges that the decision to deny reconsideration of the revocation

of her security clearance was based on "knowingly false information provided because of animus

toward Plaintiff because of her race, national origin, and/or protected EEO activity."  *Id.* ¶ 68.

Plaintiff filed her original action in this complaint on November 11, 2022.  *See* Compl,

ECF No. 1.  Defendant moved to dismiss in part, and Plaintiff filed the amended complaint under

Fed R. Civ. P. 15(a)(1)(B).  *See* Am. Compl.  Plaintiff now brings four counts against Defendant,

including three counts under Title VII: disparate treatment based on her race and national origin

(Count I); hostile work environment based on her race and national origin (Count II); and

unlawful retaliation based on her protected EEO activities (Count III).  *Id.* ¶¶ 70–79. Plaintiff

also brings a due process claim based on the reconsideration of the revocation of her security

clearance (Count IV).  *Id.* ¶¶ 80–81.  Plaintiff alleges that because of the Agency's retaliation,

discrimination, hostile work environment, and due process violations, she has "suffered

monetary damages, including emotional distress, mental anguish, lost pay, lost benefits and harm

to her professional reputation."  *Id.* ¶ 69.

Defendant again moved to dismiss in part, arguing that Plaintiff failed to administratively exhaust her disparate treatment claim (Count I) to the extent it pertains to actions before February 28, 2012.[4]  *See* Def.'s Mot. Dismiss, ECF No. 18; Def.'s Mem. P&A. Supp. Mot. Dismiss ("Def.'s Mem."), ECF No. 18-1, at 6.  Defendant also argues Count I should be dismissed to the extent that it is based on "actions that do not constitute personnel actions" under Title VII.  *See* Def.'s Mem. at 6.  In addition, Defendant contends that Plaintiff has not sufficiently pleaded a claim for hostile work environment and that Count II should be dismissed in full.  *Id.* at 11.  Finally, Defendant also argues that Plaintiff's due process claim, Count IV, should be dismissed in full because there is no property or liberty interest in a security clearance. *Id.* at 17.  The motion to dismiss is fully briefed and ripe for decision.  *See* Pl.'s Mem. P&A Opp. Partial Mot. Dismiss ("Pl. Opp'n"), ECF No. 22; Def.'s Reply Supp. Mot. Dismiss ("Def.'s Reply"), ECF No. 24.

Plaintiff filed a motion to proceed under pseudonym when initially bringing this action, which was granted.  *See* Mem. & Order, ECF No. 3.  Plaintiff filed another motion to proceed under pseudonym when the case was assigned to this Court, which Defendant opposed.  Pl.'s Mot. to Proceed Under Pseudonym, ECF No. 7; Def.'s Mem. Opp. Motion to Proceed Under Pseudonym, ECF No. 13.  The Court granted Plaintiff's motion, finding that her position as an anonymous intelligence officer was highly sensitive, and that she and others could be at risk of retaliation from foreign actors if this litigation revealed her identity.  *See* Mem. Op. Granting Motion to Proceed Under Pseudonym, ECF No. 26.

---

[4] Defendant does not challenge Plaintiff's retaliation claim except to say it is not administratively exhausted to the extent that it concerns the reconsideration of Plaintiff's security clearance.  As explained, *infra* at 24 & n.12, Plaintiff's opposition clarifies that her retaliation claim does not overlap with her security clearance claim.

### III.  LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a complaint" by asking whether the plaintiff has properly stated a claim for which relief can be granted.  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  In considering such a motion, the complaint must be construed "liberally in the plaintiff's favor with the benefit of all reasonable inferences derived from the facts alleged."  *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006) (citing *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, [if] accepted as true, to state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to withstand a motion to dismiss.  *Id.*  Similarly, there is no obligation to accept plaintiff's legal conclusions as true, nor to presume the truth of legal conclusions that are couched as factual allegations.  *See Twombly*, 550 U.S. at 555.  Finally, the Court may consider "any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice."  *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

## IV.  ANALYSIS

### A.  Plaintiff's Disparate Treatment Claim Partially Fails Administrative Exhaustion
### Requirement

"Before a federal employee can file suit against a federal agency for violation of Title

VII, the employee must run a gauntlet of agency procedures and deadlines to administratively

exhaust his or her claims."  *Crawford v. Duke*, 867 F.3d 103, 105 (D.C. Cir. 2017); *see* 42 U.S.C.

§ 2000e-16(c).  To administratively exhaust a Title VII claim, a federal employee complainant

must contact their agency's EEO counselor to initiate informal counseling "within 45 days of the

date of the matter alleged to be discriminatory or, in the case of a personnel action, within 45

days of the effective date of the action."  29 C.F.R. § 1614.105(a)(1).  If a plaintiff does not

satisfy this requirement, the Court cannot hear a Title VII claim.  *Latson v. Holder*, 82 F. Supp.

3d 377, 384 (D.D.C. 2015).  Moreover, "[w]hen an employee alleges that she was the victim of a

discrete or discriminatory act, the timeliness inquiry focuses on that particular act."  *Mohmand v.*

*Broad. Bd. of Governors*, No. 17-cv-618 (RDM), 2018 WL 4705800, at *4 (D.D.C. Sept. 30,

2018) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002)).  That means

"'discrete discriminatory acts are not actionable if time barred, even when they are related to acts

alleged in [a] timely' manner in the administrative process."[5]  *Id.* (citation omitted).

Defendant observes that Plaintiff allegedly first contacted an EEO counselor on April 13,

2012, Am. Compl. ¶ 10, which means that any discrete discriminatory acts that took place on or

before February 28, 2012 (the period beginning more than 45 days before April 13, 2012) fail the

---

[5] Similarly, only the claims that are contained in the administrative complaint or that are
"like or reasonably related" to the allegations of the administrative complaint can be raised in a
following lawsuit.  *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (quoting *Cheek v.*
*W. and S. Life Ins. Co.*, 31 F.3d 497, 500 (7th. Cir 1994)).

administrative exhaustion requirement.  In response, Plaintiff concedes that she is only raising

events before that date as part of her hostile workplace environment claim.[6]  *See* Pl. Opp'n at 4;

Def.'s Reply at 1 (acknowledging Plaintiff's concession).  Accordingly, Plaintiff cannot base her

disparate treatment claim (Count I) on her allegations concerning late 2011, which include Ms.

Lindenauer's November 2011 request that Plaintiff submit to a polygraph, security officials'

December 2011 request that Plaintiff submit a list of foreign social media contacts, or the

statement of allegiance that Ms. Lindenauer demanded Plaintiff sign in December 2011.[7]  *See*

Am. Compl. ¶¶ 17, 20, 23, 28.

---

[6] "A charge alleging a hostile work environment claim…will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period."  *Morgan,* 536 U.S. at 122.  Defendant does not raise any administrative exhaustion issues with respect to Plaintiff's hostile work environment claim.

[7] This Court has previously noted that "[t]here appears to be some disagreement among the federal courts as to whether Federal Rule of Civil Procedure 12[(b)(6)] permits a district court to dismiss a portion of a claim (i.e., a theory of liability) or rather whether Rule 12 permits only dismissal of a claim *in toto*."  *Jefferson v. District of Columbia*, No. 22-cv-1436 (RC), 2023 WL 4250118, at *6 (D.D.C. June 29, 2023) (quoting *S. Poverty L. Ctr. v. U.S. Dep't of Homeland Sec.*, 605 F. Supp. 3d 157, 160 n.1 (D.D.C. 2022)).  The latter view contends that "at the motion-to-dismiss stage, once a court determines that a claim states a viable basis for relief, it cannot further parse out whether other portions of the claim would suffice on their own."  *Fed. Trade Comm'n v. Facebook, Inc.*, 581 F. Supp. 3d 34, 60 (D.D.C. 2022) (declining to partially dismiss a Count when only some of the allegations therein stated a plausible claim for relief).  That approach maps poorly onto Title VII disparate treatment cases, where judges must parse granular details of claims to address the requirement that a complainant "must timely exhaust administrative remedies *for each discrete act alleged* . . . ."  *Mount v. Johnson*, 36 F. Supp. 3d 74, 84 (D.D.C. 2014) (quoting *Laughlin v. Holder*, 923 F. Supp. 2d 204, 209 (D.D.C. 2013)).  Because this rule means some portions of a claim may be clearly foreclosed, courts in this Circuit regularly dismiss Title VII claims in part.  *See, e.g., Heavans v. Dodaro,* 648 F. Supp. 3d 1, 12 & n.2 (D.D.C. 2022) (granting partial dismissal of certain paragraphs based on failure to exhaust); *Yaich v. Walsh*, No. 21-cv-669 (RDM), 2022 WL 3139028, at *7 (D.D.C. Aug. 5, 2022) (same).  Ultimately, given Plaintiff's concession, the issue makes little difference here.

**B.  Plaintiff States a Hostile Work Environment Claim**

To demonstrate a hostile work environment, "a plaintiff must show that his employer subjected him to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Baloch v. Kempthorne,* 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  "Determining whether an actionable hostile environment claim exists requires an examination of all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Morgan*, 536 U.S. at 103.  "Importantly, the plaintiff must establish that the allegedly harassing conduct complained of was based on a protected characteristic."  *Byrd v. Vilsack*, 931 F. Supp. 2d 27, 45 (D.D.C. 2013) (citation omitted). Overall, "[t]he bar for demonstrating a hostile work environment is a high one . . . ."  *Achagzai v. Broad. Bd. of Governors*, 170 F. Supp. 3d 164, 183 (D.D.C. 2016).

"[A]lthough a plaintiff may not combine discrete acts to form a hostile work environment claim without meeting the required hostile work environment standard, neither can a court dismiss a hostile work environment claim merely because it contains discrete acts that the plaintiff claims (correctly or incorrectly) are actionable on their own."  *Baird v. Gotbaum*, 662 F.3d 1246, 1252 (D.C. Cir. 2011).  That said, "courts in this district are generally skeptical of plaintiffs 'bootstrap[ping] their alleged discrete acts of retaliation into a broader hostile work environment claim.'"  *Tyes-Williams v. Whitaker*, 361 F. Supp. 3d 1, 9 (D.D.C. 2019) (quoting *Walden v. Patient-Centered Outcomes Rsch. Inst.*, 177 F. Supp. 3d 336, 344 (D.D.C. 2016)); *see also Townsend v. United States*, 236 F. Supp. 3d 280, 312 (D.D.C. 2017) ("Use of the same

discrete acts, upon which the plaintiff bases his discrimination ... claims, to support a hostile

work environment claim is disfavored.").  In other words, while plaintiffs may not simply

replead a retaliation or disparate impact claim as a hostile work environment claim, "incidents of

disparate treatment *can* establish a hostile work environment if connected in [a] pervasive pattern

of severe harassment . . . ."  *Wade v. District of Columbia*, 780 F. Supp. 2d 1, 19 (D.D.C. 2011)

(emphasis added).

Here, Plaintiff's hostile work environment claim depends on a pattern of specific

incidents of disparate treatment and retaliation during her time with the Agency, supplemented

with additional allegations that speak to her workplace environment.[8]  Plaintiff received intense

scrutiny and a series of negative employment actions linked to her race and national origin,

including "seven interviews in seven months," *see* Pl. Opp'n at 7, and then two "grueling and

aggressive" polygraph examinations.  Am. Compl. ¶ 40.  Plaintiff was also repeatedly called into

security meetings, directed to report all of her foreign social media contacts and then to cease all

contact with foreign nationals, and made to sign a statement of allegiance as well as another

sworn statement a few months later.  *See id.* ¶¶ 33, 36, 50–51.  At one point, Plaintiff's training

course classmates reported her for socializing in a group with other Asian Americans.  *Id.* ¶ 31.

Eventually, Plaintiff lost her security clearance and her job.  *Id.* ¶¶ 59–63.  This pattern of events

resembles the "*intimidation*, ridicule, and insult," *Baloch,* 550 F.3d at 1201 (emphasis added)

(quoting *Harris*, 510 U.S. at 21), that states a claim for hostile work environment.

---

[8] Plaintiff's hostile work environment claim is slightly broader than her disparate impact claim because it includes the late 2011 events that she failed to exhaust for that claim, such as Plaintiff's initial conversations with Ms. Lindenauer about her travel to Jamaica and her participation as Miss China, and Ms. Lindenauer asking Plaintiff to sign the statement of allegiance.

Plaintiff also makes allegations that "pertain to reports of . . . behavior that Plaintiff received but did not experience." *Garza v. Blinken*, No. 21-cv-02770 (APM), 2023 WL 2239352, at *7 (D.D.C. Feb. 27, 2023). Generally, "[c]onduct directed at others rather than at plaintiff ... is less indicative of a hostile work environment." *Id.* (quoting *Lester v. Natsios*, 290 F. Supp. 2d 11, 31 (D.D.C. 2003)). In particular, the amended complaint alleges that Ms. Lindenauer and others used demeaning language about an Asian American employee, calling him a "house boy" and seemingly indicating that he should be used as target practice at a shooting range. Am. Compl. ¶¶ 47–48. Ms. Lindenauer also allegedly suggested to investigators that Asian Americans should not work in the intelligence community. *Id.* ¶ 47.

Plaintiff does not allege that she was aware of this offensive behavior when it first occurred—she apparently learned about it from the preliminary assessment of an Inspector General investigation—but that does not pose a problem for her claim. *Id.* These allegations might not independently support a claim, but they give weight to Plaintiff's contention that she received unwarranted scrutiny *because* of her race and national origin. When the same supervisor who persistently accused Plaintiff of disloyalty also made derogatory comments about another Asian American employee and even raised the possibility that Asian American employees should leave the intelligence community altogether, it is reasonable to infer that the supervisor targeted Plaintiff because of her Asian American identity. *See, e.g.*, *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 81 (1998) (emphasizing that a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive . . . connotations, but actually constituted discrimination ... because of" the employee's protected status) (cleaned up); *Lewis v. District of Columbia*, 653 F. Supp. 2d 64, 80 (D.D.C. 2009) ("It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a

linkage of correlation to the claimed ground of discrimination.") (quoting *Bryant v. Brownlee*, 265 F. Supp. 52, 63 (D.D.C. 2003)).

Furthermore, the Court rejects Defendant's position that Plaintiff's allegations are insufficiently severe or pervasive to state a claim.  Plaintiff's hostile work environment claim must be viewed in the context of her highly sensitive role with the Agency, where her security clearance was critical to her continued employment.  Defendant cites several cases where excessive work scrutiny did not support a hostile work environment claim, but none of these cases involve employment in an intelligence community role.  Additionally, there are other reasons why those examples fail to resemble the present action.  *See Holbrook v. Reno*, 196 F.3d 255, 263–64 (D.C. Cir. 1999) (upholding jury verdict that a single four-hour interview where plaintiff was extensively questioned about her past sexual relationships was insufficient to show hostile work environment); *Horsey v. Dep't of State*, 387 F. Supp. 3d 97, 110, 112 (D.D.C. 2019) (dismissing hostile work environment claim when plaintiff alleged he was required to undergo mental health evaluation to keep employment because this one incident was the only event supporting claim and plaintiff had no other allegations suggesting he faced a hostile work environment due to a protected status); *Klugel v. Clough*, No. 06-cv-01886 (HHK), 2009 WL 10692971, at *6 (D.D.C. Jan. 26, 2009) (granting summary judgment because plaintiff's hostile work environment claim was based on only one interview and plaintiff had not shown any other events were related to a protected status); *Hendricks v. Paulson*, 520 F. Supp. 2d 65, 97 (D.D.C. 2007) (granting summary judgment because defendant had "proffered legitimate non-discriminatory reasons for the series of events that [plaintiff] alleges created a hostile work environment" and plaintiff had not shown those reasons were pretext).

The Court also disagrees with Defendant's argument that Plaintiff's claim fails because she was not humiliated in front of her colleagues.  Plaintiff's opposition cites *Border v. Nat'l Real Est. Advisors*, 453 F. Supp. 3d 249, 260 (D.D.C. 2020), where the court held that the plaintiff stated a hostile work environment claim when she alleged that the defendant

> demoted her, denied her compensation she had been promised, failed to award her bonuses she had earned, failed to respond to her communications, reprimanded her, disparaged her privately and in front of colleagues and co-workers, excluded her from internal and external meetings, prohibited her from client contact, stripped her of all meaningful duties, issued her a poor performance evaluation, and terminated her employment.

*Id.*  Admittedly, those allegations provide a more comprehensive depiction of wrongful workplace conduct than the allegations here.  At the same time, just like in *Border,* Plaintiff alleges that she was targeted in a pattern of reprimands, restrictions, and scrutiny that culminated in the loss of her employment.  *See id.*  Defendant distinguishes *Border* because Plaintiff "does not allege that she was ever publicly humiliated in front of her colleagues."  Def.'s Reply at 4.  Plaintiff need not allege humiliation when she has also alleged a pattern of severe intimidation based on her protected status.  *See Baloch,* 550 F.3d at 1201 (requiring plaintiff to show "*intimidation*, ridicule, and insult") (emphasis added) (quoting *Harris*, 510 U.S. at 21).  In any event, Plaintiff's colleagues likely would have eventually caught word of the accusations against her, and it is not hard to imagine that Plaintiff may have suffered intense embarrassment and psychological distress because of the insinuations that she secretly held allegiance to a foreign government.

Defendant ultimately misses the point of Plaintiff's claim when it notes that "bosses may be harsh, unfair and rude, but conduct so characterized does not necessarily rise to the level of a Title VII violation."  *Peters v. District of Columbia*, 873 F. Supp. 2d 158, 188 (D.D.C. 2012); Def.'s Mot. at 12.  Plaintiff does not base her hostile work environment claim on a harsh, unfair and rude boss.  It would also be the wrong inquiry to ask whether Plaintiff's supervisor or co-

workers made sufficiently offensive comments.  *See, e.g.*, *George v. Leavitt*, 407 F.3d 405, 408, 416–17 (D.C. Cir. 2005) (holding that plaintiff had not demonstrated a hostile environment even though she had been told on "different occasions" and "by three separate employees to 'go back to Trinidad' or to 'go back to where [she] came from,'" was "shouted at," and told to "shut up.").

Instead, Plaintiff has pleaded that her work environment was permeated with distrust and animus toward Asian Americans, and that this environment came to bear on her through a pattern of persistent accusations that her protected statuses made her a security risk.  Plaintiff does support her discrimination and retaliation claims with many of the same allegations as her hostile work environment claim, and it is true that "an array of discrete discrimination and retaliation claims does not necessarily translate into a hostile work environment claim," *Bain v. Off. of Att'y Gen.*, 648 F. Supp. 3d 19, 61 (D.D.C. 2022), but Plaintiff has sufficiently tied together discrete events into a "severe or pervasive" pattern of behavior.  *Baloch,* 550 F.3d at 1201 (quoting *Harris*, 510 U.S. at 21).  The Court will not dismiss Count II.

### C.  The Court Rejects Defendant's Argument About the Applicable Law for Plaintiff's Disparate Treatment Claim

Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Recently, the D.C. Circuit held that "[o]nce it has been established that an employer has discriminated against an employee with respect to that employee's 'terms, conditions, or privileges of employment' because of a protected characteristic, the analysis is complete."  *Chambers v. District of Columbia*, 35 F.4th 870, 874–75 (D.C. Cir. 2022) (en banc).  Therefore, after *Chambers*, a plaintiff need no longer show "objectively tangible harm" to sustain a Title VII discrimination

17

claim. *Id.* (overruling *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999)).  Nonetheless, "the phrase [terms, conditions, or privileges of employment] is not without limits" because "not everything that happens at the workplace affects an employee's 'terms, conditions, or privileges of employment . . . .'" *Id.* at 874.

Defendant contends that *Chambers* does not apply here because Plaintiff is a federal employee, and thus, she cannot support her Title VII disparate treatment claim (Count I) on any actions that do not constitute "personnel actions" under the Civil Service Reform Act.[9]  Def.'s Mem. at 9.  The federal sector provisions of Title VII provide that "[a]ll personnel actions affecting employees or applicants for employment . . . shall be made free from any discrimination."  42 U.S.C. § 2000e-16(a).  The Civil Service Reform Act defines "personnel actions" to include an appointment, promotion, disciplinary action, transfer, reassignment, reinstatement, or a decision concerning pay, benefits, or awards.  5 U.S.C. § 2302(a)(2)(A)(i)–(xi).  This definition includes other, unenumerated "change[s] in duties, responsibilities, or working conditions" only if they are "significant."  5 U.S.C. § 2302(a)(2)(A)(xii).

Like other courts in this district, this Court declines to construe *Chambers* as limited to private-sector Title VII suits.  *Bain*, 648 F. Supp. 3d at 54.  As one of those courts persuasively summarized the position that this Court endorses,

> Although the "usual rule ... when the legislature uses certain language in one part of the statute and different language in another" is for courts to "assume[] different meanings were intended," the D.C. Circuit has "long and repeatedly held that the federal-sector provisions" of Title VII "are coterminous with their private-sector counterparts as far as the standard for an adverse action goes." *Bain*, [648 F. Supp. 3d at 53 & n.12] (alterations in original) (quoting *DePierre v. United States*, 564 U.S. 70, 83 (2011)). Thus, although the statute's public sector "personnel action" language "differs from that of the provision governing private employers," the D.C. Circuit has "held that the two contain identical

---

[9] Defendant does not seek to dismiss Count I in total: Plaintiff's termination would clearly satisfy even Defendant's higher standard, and potentially other actions as well.

prohibitions." *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007). *Chambers*
"did not so much as hint that the private-sector and federal-sector discrimination
provisions should no longer be construed alike." *Bain*, [648 F. Supp. 3d at 54].
To the contrary, *Chambers* overruled *Brown*, a case that "itself involved a federal-
employee plaintiff." *Id.* (citing *Brown*, 199 F.3d at 452). Because it remains
binding Circuit case law that Title VII's public and private sector provisions
"contain identical prohibitions," *Chambers* governs here.

*Cameron v. Blinken*, No. 22-cv-0031 (CRC), 2023 WL 5517368, at *4 (D.D.C. Mar. 22, 2023);

*see also Garza*, 2023 WL 2239352, at *5; *Baldwin v. Granholm*, No. 21-cv-2646 (ZMF), 2023

WL 2726440, at *6 (D.D.C. Mar. 31, 2023) (vacated due to clerical mistake).

But, Defendant insists, those cases fail to address the Supreme Court's decision in *Babb*

*v. Wilkie*, 589 U.S. 399 (2020).  There, the Supreme Court confronted whether the Age

Discrimination in Employment Act ("ADEA")'s federal-sector provision requires a plaintiff to

show "but-for" causation between a challenged action and age discrimination, which is the

standard under that statute's private-sector provision.  *Id.* at 402.  The Supreme Court held that

"but-for" causation is not required because the plain meaning of the federal-sector language

"demands that personnel actions be untainted by any consideration of age," *id.*, unlike the

"critically different" syntax of the private-sector provision, *id.* at 410.  In reaching this

conclusion, the Supreme Court "ascribe[d] significance" to Congress's decision to use different

language in the federal and private-sector provisions, and found it was "not unusual" that

Congress would hold the federal government to a higher standard than other employers.  *Id.* at

412.  As Defendant also notes, the Supreme Court observed that the Civil Service Reform Act's

definition of "personnel actions" was "consistent with the term's meaning in general usage" and

therefore "assume[d] that it has the same meaning under the ADEA."  *Id.* at 405.

While Defendant uses *Babb* to support the proposition that "when an anti-discrimination

statute contains different words in its federal and private-sector provisions, courts should

examine them separately and not treat them as imposing identical proscriptions," Def.'s Reply at

7, the Court is unconvinced that this broad principle derived from a case on the ADEA can be stretched to mean that *Chambers* does not apply to Title VII's federal-sector language. *Babb* is nothing new. When the D.C. Circuit decided *Chambers*, it was certainly aware of the "usual rule ... 'when the legislature uses certain language in one part of the statute and different language in another,'" courts should "assume[ ] different meanings were intended." *DePierre v. United States*, 564 U.S. 70, 83 (2011) (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711, n. 9 (2004)). But that general principle is not absolute, the D.C. Circuit has consistently interpreted Title VII's federal-sector and private-sector language in parallel, and there is no sign that *Chambers* wedged those provisions apart. *Bain*, 648 F. Supp. 3d at 53.

The Court also gives little weight to the Supreme Court's assumption that the Civil Service Reform Act's definition of "personnel actions" applied to the ADEA: the *Babb* Court did not hold that this definition was controlling, but merely commented that it was consistent with standard usage and moved on from the issue. *Babb*, 589 U.S. at 405. That observation has no effect on whether that definition must govern Title VII federal-sector claims.[10] Moreover, Defendant does not grapple with the fact that their argument would hold the federal government to a *lower* standard than the private-sector, which would be the opposite of *Babb*. *Id.* at 411–12. Defendant has not provided the compelling textual, structural, and historical evidence that would be necessary to convince this Court that Title VII's federal-sector provision should be a less-protective departure from the private-sector provision. And regardless, because D.C. Circuit

---

[10] Defendant argues that Plaintiff did not raise arguments on whether the Civil Service Reform Act's definition of "personnel actions" applies to the federal-sector provisions of Title VII, Def.'s Reply at 7, and that the issue should be treated as conceded. *Coleman v. Johnson*, 19 F. Supp. 3d 126, 134 (D.D.C. 2014). The Court notes that Plaintiff implicitly addressed this argument by contending that *Chambers* provides the correct standard, *see* Pl. Opp'n at 7, and either way, the Court declines to treat this important issue of statutory construction as conceded.

precedent binds this Court to construe the provisions together, *Chambers* applies to this action. *Cameron,* 2023 WL 5517368, at *4.

No matter, Defendant says, because some of Plaintiff's allegations also fail under the "terms, conditions, or privileges of employment" standard. Def.'s Reply at 8 (citing *Chambers*, 35 F.4th at 874).  Namely, Defendant argues that Plaintiff's discrimination claim cannot go forward to the extent it is based on allegations that Plaintiff was required to sit for "multiple polygraph exams, provide an updated list of foreign contacts including social media contacts, cease contact with foreign nationals, sign two statements of allegiance, and provide seven interviews with security investigators in seven months."  Def.'s Reply at 6.  Of course, as discussed above, many of those actions fail administrative exhaustion.  That includes the polygraph in late 2011, at least three of the interviews with security investigators, the first statement of allegiance, and Plaintiff being asked to provide her foreign social media contacts and cease contact with foreign nationals.

Of the remaining activities, the Court notes that some of these actions have not been pleaded as discriminatory, but that the rest could support a disparate treatment claim.  Notably, Plaintiff does not plead that the June 2012 polygraphs were specifically motivated by her race or national origin, but rather alleges that they were retaliatory.  The first of these polygraphs was ordered "in direct retaliation" for Plaintiff identifying Ms. Lindenauer to an EEO counselor. Am. Compl. ¶¶ 37, 38 (alleging that Plaintiff "immediately reported this retaliatory act to the EEO counselor").  The second polygraph was also a "blatant act[] of retaliation" against Plaintiff "for participating in a protected activity of filing an informal complaint with the EEO office." *Id.* ¶ 41.  Accordingly, these events likely cannot make out a discriminatory disparate treatment claim because Plaintiff never pleaded them as such.

On the other hand, the Court is persuaded that Plaintiff's allegations that she was made to attend several security meetings and forced to sign a sworn statement could satisfy *Chambers*, even though the contours of the law remain unsettled.  In the context of Plaintiff's sensitive role in the intelligence community, this unwarranted scrutiny based on her race and national origin very well could implicate the "terms, conditions, or privileges of employment."  *Chambers*, 35 F.4th at 874.  The Court rejects Defendant's comparison to *Bell v. Fudge*, No. 20-cv-2209 (CRC), 2022 WL 4534603, at *5 (D.D.C. Sept. 28, 2022), where the court noted that "false accusations of hostility toward a coworker" and "a few inconvenient meetings" were "beyond the concern[s]" of Title VII.  Here, Plaintiff allegedly faced weighty accusations of disloyalty to the United States while serving in a role where such loyalty is paramount.  To call Plaintiff's security meetings "inconvenient" would severely understate their significance.  It is not hard to surmise that those meetings placed Plaintiff's employment at peril, and that Plaintiff would have faced termination if she refused to sign the second sworn statement in April 2012.  *See, e.g.*, Am. Compl. ¶ 27 (stating that Plaintiff was told she would have to sign the first sworn statement to maintain her employment).  At the very least, one can plausibly imagine that this accusatory "employer[] conduct inhibit[ed] the [P]laintiff's potential for career advancement."  *Liu v. Georgetown Univ.*, No. 22-cv-157 (RDM), 2022 WL 2452611, at *7 (D.D.C. July 6, 2022) (finding *Chambers* satisfied at motion to dismiss stage when plaintiff alleged he was not listed as first author on a paper and prevented from orally presenting his work at a conference).

As a result, the Court finds it would be premature at this stage to say that these allegations could not be an alteration of the "terms" or "conditions" of employment.  The Court will dismiss Count I to the extent it relies on actions that fail the administrative exhaustion requirement, but otherwise allows the claim to proceed.  At this juncture of the litigation, there is

nothing to be gained in efficiency by dismissing any other portions of the claim.  While it is

uncertain whether Plaintiff has sufficiently pleaded that the June 2012 polygraphs are part of her

disparate treatment claim, those polygraphs will already be explored in discovery as part of the

hostile work environment and retaliation claims.  If necessary, that argument can be addressed at

the summary judgment stage.  *See, e.g.*, *E.M. v. Shady Grove Reprod. Sci. Ctr. P.C.*, 496 F.

Supp. 3d 338, 358 (D.D.C. 2020) (holding that defendant was "entitled to partial summary

judgment narrowing down the scope of the claims for trial.").

### D.  Plaintiff's Security Clearance Due Process Claim Fails

Plaintiff alleges that Defendant violated her right to due process by "wholly excluding"

her from participation in the reconsideration of the revocation of her security clearance.[11]  Am.

Compl. ¶ 81.  Although Plaintiff does not provide any legal foundation for this claim, based on

---

[11] Plaintiff does not challenge the initial revocation nor the ultimate decision not to reconsider that revocation, *see* Pl. Opp'n at 5, which avoids an unresolved issue in this Circuit. Defendant's initial memorandum misunderstood the amended complaint as making such a challenge and argued it was foreclosed by *Department of the Navy v. Egan*, 484 U.S. 518, 529–31 (1988), where the Supreme Court held that Merit Systems Protection Board had no authority to "review security-clearance determinations," because that review would impermissibly impede on agency discretion and be substantively impossible for a nonexpert reviewing body. Consistent with that logic and a line of cases in the Circuit extending *Egan* to judicial review of various security-clearance actions, some courts in this district have taken *Egan* to mean that judicial review of security-clearance determinations is always prohibited.  *See, e.g.*, *Borrell v. Naval Facilities Eng'g Command Wash.*, No. 1:19-cv-01160 (CJN), 2020 WL 2331794, at *4 (D.D.C. May 11, 2020).  But the D.C. Circuit has left open whether *Egan* applies "to review of security clearance decisions on the basis that they have deprived an individual of their constitutional rights."  *Gill v. United States Dep't of Just.*, 875 F.3d 677, 682 (D.C. Cir. 2017) (quoting appellant's brief) ("As interesting as this issue is, we need not reach it because, even if Gill's equal protection claims are not barred by *Egan*, they fail for other reasons.").  One member of the panel expressed the view that at least some equal protection security-clearance claims would not be barred.  *Id*. at 682–685 (Tatel, J., concurring).

her opposition filing to the present motion to dismiss, she appears to be invoking the due process clause of the Fifth Amendment.[12]

"'The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in "liberty" or "property."  Only after finding the deprivation of a protected interest do we look to see if the [government's] procedures comport with due process.'" *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 117 (D.C. Cir. 2010) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999)).  Defendant argues that Plaintiff could not have a protected interest in a security clearance.  The Court disagrees with that broad assertion.  True, no one has a property interest in a security clearance.  *Doe v. Cheney*, 885 F.2d 898, 909–10 (D.C. Cir. 1989).  But a federal agency's revocation of a security clearance may give rise to a due process claim for injury to a *liberty* interest.  *Doe v. Casey*, 796 F.2d 1508, 1522 (D.C. Cir. 1986); *see Kartseva v. Dep't of State*, 37 F.3d 1524 (D.C. Cir. 1994) (allowing a government contractor's employee who was discharged after being disqualified by the Department of State to sue for deprivation of a liberty interest without due process of law).  Indeed, claims that resemble Plaintiff's have gone forward in this Circuit.  *Ranger v. Tenet*, 274 F. Supp. 2d 1, 9 (D.D.C. 2003) (finding that plaintiff had liberty interest and adequately alleged that the CIA "did not afford [plaintiff] a meaningful opportunity to contest the basis for its decision to revoke his security clearance.").

Defendant misfires by citing *Palmieri v. United States*, 72 F. Supp. 3d 191, 206 (D.D.C. 2014) for the proposition that Plaintiff "does not have a liberty or property interest in [her]

---

[12] And so the Court need not engage with Defendant's argument that "to the extent that Plaintiff is relying on [the denial of reconsideration of her security clearance] to support her Title VII claims, Plaintiff cannot do so because she failed to administratively exhaust it."  Def.'s Mem. at 8.

security clearance, so [her] security clearance cannot serve as a predicate liberty or property interest [for a due process violation]."  Def.'s Mem at 19.  On appeal in *Palmieri*, the D.C. Circuit panel declined to endorse that reasoning and "assume[d] without deciding that [plaintiff] [had] a cognizable liberty interest" in his security clearance.[13]  *Palmieri v. United States*, 896 F.3d 579, 587 (D.C. Cir. 2018) (citing *Gill v. DOJ*, 875 F.3d 677, 681 (D.C. Cir. 2017)).  The Court is therefore not persuaded that Plaintiff could never have a sufficient liberty interest in a security clearance to support a due process claim.

Regardless, the Court need not go deeper into the issue because Plaintiff's claim is simply too lacking in detail to survive a motion to dismiss.  Even the narrative of events does not quite make sense.  Plaintiff lost her security clearance in October 2013.  Am. Compl. ¶ 60.  The complaint jumps ahead a decade, noting without elaboration that "Defendant has continued to retaliate and discriminate against Plaintiff, by interfering with her employment prospects as well as her ability to obtain a security clearance for the last 10 years."  *Id.* ¶ 64.  Then, in 2023, "Defendant never made Plaintiff aware that the revocation of her security clearance was under reconsideration," *id.* ¶ 66, until Plaintiff received a notice in February 2023 that "a request for reconsideration of the revocation of her security clearance had been denied," *id.* ¶ 65.  The amended complaint fails to make clear whether Plaintiff made this request.  Thus, the Court is left to wonder when, why, and how she requested consideration, or even if the agency reconsidered the issue sua sponte.  Without that information, the Court finds it difficult to evaluate the claim.[14]

---

[13] The panel upheld the district court's dismissal of the claim not because the plaintiff had no predicate interest, but because he received appropriate due process regardless of whether such interest existed.  *Palmieri*, 896 F.3d at 587–88.

[14] If Plaintiff did make the request herself, she could not claim to be unaware that the Agency would reconsider the revocation, even if she was not informed when the Agency began

Furthermore, the amended complaint never says what procedures were due to Plaintiff when the reconsideration request was made. *Elkins v. District of Columbia*, 690 F.3d 554, 561 (D.C. Cir. 2012) ("To state a procedural due process claim, a complaint must suggest what sort of process is due.") (citations and quotations omitted).  True, "Defendant never afforded Plaintiff an opportunity to participate in that process whatsoever," Am. Compl. ¶ 66, which would seem to fall far short of the "meaningful opportunity" to be heard that is generally required for security clearance decisions.  *Ranger*, 274 F. Supp. 2d at 9.  Plaintiff's flat assertion of total exclusion might well be enough if, like in *Ranger*, she based her claim on the initial revocation.  But she does not, and instead attacks only Defendant's reconsideration of a decision from ten years in the past.  The Court cannot find a properly pleaded due process claim when Plaintiff has not coherently described what happened with her reconsideration versus what should have happened.

There are other puzzling elements and deficiencies in the amended complaint.  Plaintiff "has also received four notices of separation from the U.S. Army under the pretense of a lack of a security clearance" apparently following the denial of the reconsideration of her security clearance, but the Court cannot understand why those notices would come only after Defendant denied reconsideration of a decade-old revocation, and the amended complaint has no detail about how Plaintiff's career progressed after her termination from federal service in 2014.[15]  Am. Compl. ¶¶ 63, 66.  Other than bringing up these notices of separation, Plaintiff makes only cursory assertions of the harm she has suffered "including emotional distress, mental anguish,

---

that process.  While this distinction may not ultimately matter to the substance of whether Plaintiff received due process, it is illustrative of the amended complaint's scarcity of detail. And if Plaintiff did not make the request, and the agency reconsidered the issue sua sponte, the Court has even more questions.

[15] The Court assumes that Plaintiff is trying to establish such causation because her allegations about these notices of separation are found in the same paragraph where Plaintiff alleges she was unaware of the reconsideration of her security clearance.  *See* Am. Compl. ¶ 66.

lost pay, lost benefits and harm to her professional reputation" following the 2023 denial of

reconsideration.  *Id.* ¶ 69.  And so the Court finds that Plaintiff has not explained how her

inability to participate in the reconsideration of her security clearance implicates a liberty

interest.[16]  *Iqbal*, 556 U.S. at 678 (holding that to survive a motion to dismiss, a plaintiff must

make more than "unadorned, the-defendant-unlawfully-harmed-me accusation[s]").

Accordingly, the Court will grant the motion to dismiss Count IV.

## V.  CONCLUSION

For the foregoing reasons, Defendant's Partial Motion to Dismiss is **GRANTED in part**

and **DENIED in part** (ECF No. 18).  An order consistent with this Memorandum Opinion is

separately and contemporaneously issued.

Dated:  February 29, 2024                                        RUDOLPH CONTRERAS
                                                                 United States District Judge

---

[16] Although the Court avoids a full discussion of the caselaw because Plaintiff's allegations are so deficient, "[a] line of decisions from the D.C. Circuit has delineated two situations in which an adverse government employment decision might infringe a protected liberty interest."  *Lamb v. Millennium Challenge Corp.*, 498 F. Supp. 3d 104, 113 (D.D.C. 2020). In the first situation, a "reputation-plus" claim, the plaintiff must show "the conjunction of official defamation and adverse employment action."  *O'Donnell v. Barry*, 148 F.3d 1126, 1140 (D.C. Cir. 1998).  In the second, a "stigma-plus claim", a plaintiff must show "the combination of an adverse employment action and 'a stigma or other disability that foreclosed [the plaintiff's] freedom to take advantage of other employment opportunities.'"  *Id.* (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573 (1972)).