**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| JANE DOE, | : | | |
| Plaintiff, | : | Civil Action No.: | 22-3474 (RC) |
| v. | : | Re Document No.: | 39 |
| PETE HEGSETH, Secretary of Defense, | : | | |
| Defendant. | : | | |

# MEMORANDUM OPINION

## GRANTING IN PART AND DENYING IN PART WITHOUT PREJUDICE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

Plaintiff Jane Doe,[1] a former intelligence officer in the Defense Intelligence Agency ("DIA"), sues Defendant Secretary of Defense Pete Hegseth (the "Secretary"), in his official capacity, for her employer's alleged discrimination, retaliation, and creation of a hostile work environment. She alleges that the DIA, through its Office of Security, subjected her to an intense security review and ultimately suspended her security clearance, resulting in her termination, because of her race and because she complained of discriminatory treatment.

The Secretary moves for summary judgment on all claims, arguing primarily that the Office of Security acted not out of unlawful animus but rather investigated and revoked Ms. Doe's security clearance because she lied during a security interview and there were reports of other suspicious behavior. Ms. Doe admits that she lied. But she seeks to overcome the Secretary's explanation by presenting evidence that discrimination against Asian Americans

---

[1] Ms. Doe proceeds under a pseudonym. *See* Order Granting Pl.'s Mot. Proceed Under Pseudonym, ECF No. 25.

pervaded the Office of Security and therefore motivated its decisions. She also argues that her employer decided to readjudicate the security clearances of a group of employees, including Ms. Doe, in response to and in retaliation for their complaints about their discriminatory treatment.

At the heart of this case, then, lies a dispute over whether the Office of Security investigated and ultimately suspended Ms. Doe's security clearance out of discriminatory and retaliatory animus or because it believed Ms. Doe might pose a security risk. This Court, however, cannot answer that question. Nor can a jury. When it comes to security clearances, a long line of cases starting with the Supreme Court's decision in *Department of the Navy v. Egan*, 484 U.S. 518 (1988), precludes courts and juries from second-guessing professional security experts' judgments about whether someone may be trusted with the nation's most sensitive secrets. That includes efforts to ascertain the true motivations behind and uncover pretextual explanations in professional security-clearance decisions. Claims requiring such analysis are nonjusticiable. The Court therefore grants summary judgment in favor of the Secretary on Ms. Doe's retaliation and discrimination claims. The Court, however, denies without prejudice summary judgment on Ms. Doe's hostile-work-environment claim because the parties have not yet litigated whether that claim is justiciable.

## II. FACTUAL BACKGROUND

Ms. Doe was born in Hong Kong as a British National. Pl.'s Ex. 2 ("Doe Dep.") at 17:23–18:13.[2] She is ethnically Chinese and identifies as Chinese American, having since

[2] The parties have attached their evidence in support of their positions in Defendant's Exhibits, ECF No. 39-2, and Plaintiff's Exhibits, ECF No. 48-2, respectively. The Court refers to these exhibits by the particular exhibit number. The page numbers refer to the automatically generated ECF page numbers, except for documents with paragraph or lines numbers, such as depositions and declarations, in which case those numbers are used.

naturalized in the United States. *See id.* at 17:12–22, 18:4; Pl.'s Ex. 1 at 55:7–12. She moved to the United States when she was three years old and "never held dual citizenship." *Id.*

Ms. Doe applied for an internship with the DIA, a part of the United States Department of Defense, in 2009. *See* Doe Dep. at 21:8–16. But she did not start until the spring of 2011 because it took about two years for her to receive a security clearance. *Id.* at 21:11–21. At the internship, her work focused on analyzing "China's military capabilities." *Id.* at 22:9. In June of that year, Ms. Doe accepted a full-time offer from the DIA to serve as an intelligence officer. *Id.* at 22:16–20, 24:4–6.

In November 2011, four months later, Ms. Doe took a trip to Jamaica to participate in the Miss United Nations pageant. *Id.* at 24:7–12, 24:25–25:3. Because the pageant representative for the United States had already been selected, the pageant organizers recommended that Ms. Doe represent China, which she did. *Id.* at 26:25–27:19. Ms. Doe saw her participation as Ms. China as "a presentation of [her] ethnicity and . . . the culture" rather than as a "representation of [her] nationality or any nation." *Id.* at 28:20–24.

A few weeks later, after she had returned from Jamaica, Ms. Doe received an email from Special Agent Krisanne Lindenauer at the DIA's Office of Security asking to schedule a meeting. *Id.* at 31:1–32:18. At the meeting, Ms. Lindenauer asked Ms. Doe questions about why she "entered the defense industry" and about "the purpose of [her] trip." *Id.* at 33:15–22. With respect to the trip, Ms. Doe answered that she had traveled for "personal reasons." *Id.* at 33:24.

In early December, the Office of Security received a report that, during her Jamaica trip, Ms. Doe had represented China in a "modeling competition." Def.'s Ex. 3 at 50. Ms. Lindenauer quickly scheduled a follow-up interview with Ms. Doe, during which she asked

Ms. Doe if she had participated in "any modeling competitions" while traveling in Jamaica. Doe Dep. at 39:5–10. Ms. Doe answered "no." *Id.* at 39:23. As Ms. Doe saw it, she had participated in a "pageant," but "a pageant is not a modeling competition" because modeling involves "a commercial purpose to promote some type of brand." *Id.* at 39:24–40:8; *see also* Pl.'s Ex. 9 at 66 (Ms. Doe: "I define pageantry as a contest between participants for scholarship that depends heavily on presentation."). But Ms. Doe did not explain this distinction or mention the pageant during the interview. Doe Dep. at 40:9–11. Making matters worse, even setting aside the distinction between pageants and modeling competitions, Ms. Doe "denied representing China or Hong Kong in any pageants/events since becoming a DIA employee." Def.'s Ex. 3 at 51.[3] At the interview, Ms. Lindenaur also asked Ms. Doe for an updated list of her foreign contacts. *See* Doe Dep. at 38:6–18.

Later that same day, Ms. Doe tried to contact Ms. Lindenaur to "set th[e] record straight" by explaining that she had participated in a pageant in Jamaica. *See id.* at 47:7–48:9. But, according to Ms. Doe, Ms. Lindenaur "had already left for the day," so they could not meet "until the following Monday." *Id.* at 48:6–9. On that Monday, Ms. Doe admitted that she had participated as Miss China at the pageant in Jamaica. *See id.* 48:20–49:2. She told

[3] It is not entirely clear to the Court that Ms. Doe admitted to making this statement when asked at her deposition. *See* Doe Dep. at 47:19–48:4. Nor does she reference it in her chronology. *See* Pl.'s Ex. 9 at 66–67. Instead, in her deposition, Ms. Doe appears to be saying that she wanted to explain the distinction between modeling competitions and pageants. Doe Dep. at 47:19–48:4. Nonetheless, in her statement of facts, Ms. Doe explicitly admits that she claimed to have never participated in a pageant after beginning to work at the DIA during the December interview. *Compare* Def.'s Statement Facts ¶ 9, ECF No. 39-1 ("Doe also denied having represented 'any foreign countries in pageants since joining DIA.'" (internal quotation omitted)), *with* Pl.'s Statement Facts ¶ 28, ECF No. 48-1 ("Plaintiff admits to Defendant's Fact No. 9 that during her interview with SO Lindenauer she denied having represented any foreign country in pageants since becoming employed by Defendant." (citing Doe Dep. at 47–48)). Because Ms. Doe admits to making the statement, the Court accepts it as an undisputed fact.

Ms. Lindeanaur that she had not disclosed the pageant because she "was afraid of being objectified" by "[t]he male workforce at the Department of Defense." Def.'s Ex. 1 at 50:8–12.

Shortly thereafter, Ms. Doe signed a sworn statement reaffirming "her allegiance to the U.S. and den[ying] allegiance to China." Pl.'s Ex. 6 at 48; *see* Pl.'s Ex. 12. In the statement, Ms. Doe admitted that she "was untruthful about [her] involvement in [her] last pageant." Pl.'s Ex. 12 at 113. Ms. Doe also agreed to sit for an "specific issue polygraph examination concerning issues discussed during [her] interviews with" Ms. Lindenaur and "to address foreign preference and foreign allegiance issues." *Id.* at 114.

A few months later, in February 2012, DIA employees reported concerns about Ms. Doe. *See* Pl.'s Ex. 13 at 117–19; *see also* Def.'s Statement Facts ¶ 11. The first employee stated that they had seen Ms. Doe "reviewing pictures of other [redacted] students on her desktop and typing notes on a separate window." Pl.'s Ex. 13 at 118. The employee had "initially dismissed it as suspicious because [Ms. Doe] usually makes notes on everything class related and has an odd personality." *Id.* In a subsequent interview, the employee added that Ms. Doe "was often the last person to leave the classroom for the day and took notes on everyone in attendance in the course." Pl.'s Ex. 10 at 101. Although it is difficult to tell because of redactions in the document, it appears that the source clarified that they only knew this information "second hand." *Id.*

The second employee reported that Ms. Doe was "asking . . . about a member of [their] class and taking notes on that person. The sheet she was writing on appeared to be a list of names . . . ." Pl.'s Ex. 13 at 119. The employee "found this strange" because they had "heard" that Ms. Doe "gathers peoples [sic] phone numbers, keeps them on a list, and contacts them once every two years to keep them as contacts[,] raising more concerns." *Id.* The employee also

stated that Ms. Doe would attend a "club" where "she arrived with a group of around ten individuals[,] some of Asian decent [sic]." *Id.*

There was another report in March; it is unclear whether that report also came from one of the two employees who made prior reports or came from a different employee, but Ms. Doe characterizes it as coming from the same employee as the second report. *See* Pl.'s Ex. 10 at 101; Pl.'s Statement Facts ¶ 43, ECF No. 48-1. The report stated that Ms. Doe "stayed late and was the last one to leave the classroom every night" even though the "course material was not difficult and there was no reason" to stay late. Pl.'s Ex. 10 at 101. Ms. Doe apparently "took notes on the other students," including their pictures. *Id.* The employee also reported that, when Ms. Doe was confronted about this, she explained that she took notes to "make sure [she] remembered everyone" so that she could "contact anyone in the future." *Id.* According to the employee, "no one else in the class took notes on each other or stayed late in order to complete work." *Id.* Finally, the employee reported that Ms. Doe "gave everyone a greeting card" at the end of the course and gave them "chopsticks" as a gift, which the employee thought was "strange." *Id.*

In April, Ms. Lindenaur interviewed Ms. Doe again. *See* Def.'s Ex. 5 at 65. According to Ms. Doe, Ms. Lindenaur asked her about "whether [she] was collecting information on [her] classmates" and housemates. Doe Dep. at 63:24–64:3. Ms. Doe also provided answers to a series of questions regarding her actions in class and whether she took notes on her classmates, among other things, in a sworn statement after the interview. *See* Pl.'s Ex. 15 at 126–28.

Later in April, Ms. Doe filed an informal complaint about Ms. Lindenaur. *See* Doe Dep. at 78:9–15. At her deposition, Ms. Doe explained that she filed the complaint because she "had already participated in seven security interviews with a security officer," and the "interviews

were becoming more hostile." *Id.* at 78:25–79:1. An Equal Employment Opportunity counselor interviewed Ms. Lindenaur in connection with Ms. Doe's complaint on May 23, 2012. *See* Pl.'s Ex. 8 at 59.

Ms. Doe then sat for polygraph examinations on June 5 and June 7, 2012. *See* Def.'s Ex. 6 at 71, 73. For the June 5 polygraph examination, Ms. Doe "did not complete Series I" but did complete "Series II with no reportable information developed." Pl.'s Ex. 17 at 135. (It is not clear to the Court what the distinction between Series I and Series II is.) The subsequent June 7 polygraph examination was a "continuation" of the June 5 polygraph examination. Pl.'s Ex. 18 at 137. This later polygraph examination concluded with "no reportable information developed" and advised that "[n]o additional polygraph testing [was] required." *Id.* at 138. On June 21, 2012, Ms. Lindenaur completed a report documenting her investigation into Ms. Doe. *See* Def.'s Ex. 3 at 43.

About two weeks later, on July 5, 2012, DIA Deputy Director David Shedd directed the Office of Security to initiate a Counterintelligence Review and Risk Assessment of Ms. Doe. *See* Pl.'s Ex. 25 at 179; *see also* Def.'s Statement Facts ¶ 18, ECF No. 39-1. The assessment "attache[d] critical counterintelligence risk to the continued placement and access of" Ms. Doe. Pl.'s Ex. 25 at 181. Ms. Doe had been scheduled to deploy to Afghanistan in January 2013, but her deployment was canceled. *See* Doe Dep. at 110:4–10. According to John L. May, a special agent at the Office of Security, "if an employee is under investigation, they cannot deploy. So, if [Ms. Doe] was under investigation or undergoing unfavorable action at the time, her deployment would have been canceled." Def.'s Ex. 10 ¶ 63. Mr. May states that "[t]his is standard policy, and the decision is not totally made by the Office of Security." *Id.*

About a week after terminating her deployment, the DIA issued Ms. Doe an Intent to Revoke Access to Sensitive Compartmented Information, which represented "[a] preliminary decision . . . to revoke [her] access" to classified information. *See* Pl.'s Ex. 26 at 183. With her security clearance suspended, Ms. Doe was placed on administrative leave. *See* Doe Dep. at 117:11–14. On September 11, 2013, the DIA issued Ms. Doe a Notice of Proposed Indefinite Suspension because "[d]uring the pendency of the adjudication of [her] security clearance, [she did] not have access to classified material, rendering [her] incapable of performing any of the duties assigned to [her]." Def.'s Ex. 11 at 100–01. The next month, the DIA revoked Ms. Doe's security clearance, *see* Def.'s Ex. 12 at 104, and a year later the DIA formally terminated Ms. Doe, *see* Def.'s Ex. 13 at 107.

In parallel to Ms. Lindenaur's investigation of Ms. Doe, beginning in June 2012, the DIA conducted an internal investigation into "the circumstances surrounding several . . . mistreatment and discrimination allegations of DIA Asian-American[ ] and Middle Eastern-American[ ]" employees. Pl.'s Ex. 23 at 173. The investigation report noted that beginning in April of that year "several employees" posted on a message board about "being harassed during DIA's counterintelligence security screening." *Id.* Ms. Doe states that she was interviewed as part of the investigation into the allegedly discriminatory practices around June 28, 2012. *See* Pl.'s Ex. 1 at 11:1–8.

On July 2, 2012—shortly after Ms. Doe's interview and three days before Deputy Director Shedd ordered the Office of Security to conduct a Counterintelligence Review and Risk Assessment of Ms. Doe—agency leadership held a meeting where they discussed the internal

investigation. *See* Pl.'s Ex. 24 at 177.[4] An email after the meeting recounts that "[e]veryone was happy to hear that the [Office of the Inspector General] was conducting the . . . investigation." *Id.* But someone at the meeting "advised" that DIA Deputy Director David Shedd "wanted this issue resolved as soon as possible" and that this would "include . . . adjudicating some of the complainants with security clearances." Pl.'s Ex. 23 at 175; Pl.'s Ex. 24 at 177.

As part of the investigation, the inspector general's office interviewed Ms. Lindenaur in late July. *See* Pl.'s Ex. 6 at 47. According to a report of the interview, Ms. Lindenaur acknowledged seeing a "photograph depicting an Asian male sitting under a pistol target with the word 'Fear' on it" in the empty cubicle of a coworker. *Id.* at 48. But Ms. Lindenaur largely denied allegations that she engaged in improper conduct. *See id.* For example, she denied allegations that she had called an Asian-American employee a "house boy" or a "snitch" as well as other derogatory remarks. *Id.* She stated that "she laughed at the banter exchanged between investigators," but "did not think any of the banter was offensive to anyone." *Id.*

A document attached to the report, labeled "Questions for SA Lindenaur," largely corroborates the report. *See id.* at 50–51. But, unlike the report, next to a question asking whether Ms. Lindenaur called an Asian-American coworker "House boy," there is a handwritten "Yes." *Id.* at 50. In addition, next to a question about "what can be done to reduce/eliminate the perception of harassing or discriminatory practices," the following is written in by hand: "Nothing, maybe they should not be working in the [intelligence community] . . . ." *Id.* at 51.[5]

---

[4] Ms. Doe also notes that her ex-fiancé had also participated in the inspector-general investigation and was similarly issued a Counterintelligence Review and Risk Assessment. *See* Pl.'s Ex. 1 at 11:15–19.

[5] The Secretary argues that the report contradicts any notion that Ms. Lindenaur admitted to participating in racist jokes or name calling. *See* Def.'s Reply at 5–6. That may be true. But

Jumping forward almost a decade, Ms. Doe sued the Secretary in November 2022. *See* Compl. at 15, ECF No. 1. The Secretary initially filed a partial motion to dismiss, which this Court granted in part and denied in part. *See Doe v. Austin*, No. CV 22-3474 (RC), 2024 WL 864270, at *1 (D.D.C. Feb. 29, 2024). The Secretary now moves for summary judgment on the remaining claims. *See* Def.'s Mot. Summ. J. & Mem. Supp. Thereof ("Def.'s Mot.") at 1, ECF No. 39.

## III. LEGAL STANDARD

To prevail on a motion for summary judgment, the moving party must "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must "view the evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in her favor, and eschew making credibility determinations or weighing the evidence." *Johnson v. District of Columbia*, 182 F.4th 1052, 1062 (D.C. Cir. 2026) (cleaned up).

## IV. ANALYSIS

The parties understandably devote much of their briefs to the merits of Ms. Doe's employment claims. The Court, however, does not reach the merits. Instead, it focuses on whether it may review Ms. Doe's claims at all.

Because Ms. Doe's retaliation and discrimination claims relate to her loss of a security clearance, the Court must consider whether her claims are justiciable. This question originates with the Supreme Court's decision in *Department of the Navy v. Egan*, 484 U.S. 518 (1988). In

---

the questionnaire following the report is also evidence. Although it is unclear who wrote the comments next to the questions or the context surrounding them, the Secretary has not disputed the authenticity of the document, and this is not the appropriate juncture to debate its persuasive weight.

that case, the Supreme Court held that Congress had not authorized the Merit Systems Protection Board "to review the substance of an underlying decision to deny or revoke a security clearance." *Id.* at 520, 530. The Supreme Court based its decision in part on Article II of the United States Constitution. *See id.* at 527. It focused on the President's "authority to classify and control access to information bearing on national security and to determine whether an individual is sufficiently trustworthy to" access that information. *Id.* The Supreme Court also drew upon the traditional reluctance of courts to "intrude upon the authority of the Executive in military and national security affairs." *Id.* at 530 (collecting cases).

Although *Egan* was, at least formally, a statutory-interpretation decision regarding a particular statute, since then, the D.C. Circuit has extended *Egan*'s reach to other employment claims and even constitutional claims, rendering those claims "nonjusticiable." *See Lee v. Garland*, 120 F.4th 880, 883, 895 (D.C. Cir. 2024). Most relevant here, the D.C. Circuit has held that the logic of *Egan* prevents courts and juries from second-guessing the true motivations of security professionals who claim to have suspended a security clearance for security reasons. *See Ryan v. Reno*, 168 F.3d 520, 523–24 (D.C. Cir. 1999). Because the Court concludes that Ms. Doe's discrimination and retaliation claims would invite just such second guessing, it grants the Secretary's motion for summary judgment on those counts.

**A.**

When considering whether a claim is justiciable under *Egan*, the Court must first determine whether the connection between the claim and the sensitive security-clearance determinations is sufficient to trigger *Egan*. The D.C. Circuit has cautioned that a claim is not "nonjusticiable simply because it tangentially relates to a security clearance." *Lee*, 120 F.4th

at 892. But *Egan* generally bars claims that "challenge the substantive basis" of a security-clearance decision. *Id.* at 886.

Here, Ms. Doe's retaliation and discrimination claims challenge the substantive basis of decisions regarding whether she could be trusted with a security clearance—either the decision to revoke the clearance or the investigation into whether to revoke it. The allegedly discriminatory and retaliatory acts that Ms. Doe identifies are as follows:

(1) interviews and polygraph examinations conducted by the Office of Security, First Am. Compl. ¶¶ 17–20, 30, 33, 36–37, 40–41, ECF No. 16;

(2) requesting a Statement of Allegiance and another sworn statement, also from the Office of Security, *id.* ¶¶ 23, 33;

(3) a Counterintelligence Review and Risk Assessment and decision to readjudicate Ms. Doe's security clearance, both of which were to be conducted by the Office of Security, *id.* ¶¶ 43–45; Pl.'s Statement Facts ¶¶ 80–81;

(4) an instruction not to contact foreign nationals and report her foreign contacts on social media, First Am. Compl. ¶¶ 50–51;

(5) a security concern over a bank account, *id.* ¶ 52;

(6) reports from other employees that Ms. Doe was engaging in suspicious conduct, *id.* ¶ 31;

(7) the cancellation of her scheduled deployment to Afghanistan, *id.* ¶ 55;

(8) placement on administrative leave without duties, *id.* ¶ 56;

(9) Ms. Doe's indefinite suspension and ultimate removal from her position, *id.* ¶¶ 59, 63; and

(10) the revocation of Ms. Doe's security clearance and denial of a request for reconsideration, *id.* ¶¶ 60, 65; *see also* Pl.'s Mem. P. & A. Opp'n Def.'s Mot. Summ. J. ("Pl.'s Opp'n") at 21, ECF No. 48 (listing grievances).[6]

Some of the employment actions that Ms. Doe challenges fit seamlessly within *Egan*'s zone of nonjusticiability. Ms. Doe invokes the fact that her security clearance was revoked and that she was terminated because she lacked a security clearance, which she could not perform her job without, to support her retaliation and discrimination claims. *See* Pl.'s Opp'n at 31 (retaliation claim); *id.* at 35 (discrimination claim); *see also* Pl.'s Statement Facts ¶ 101 ("Plaintiff was unable to perform her duties as a direct result of Defendant revoking the access to SCI she needed to perform her duties."). These employment actions are nonstarters because

---

[6] Many of these events—such as the interviews after Ms. Doe's Jamaica trip—likely apply only to Ms. Doe's hostile-work-environment claim because Ms. Doe failed to exhaust them and therefore cannot challenge them as part of her other claims. *See Doe v. Austin*, No. CV 22-3474 (RC), 2024 WL 864270, at *6 (D.D.C. Feb. 29, 2024) (finding that Ms. Doe "cannot base her disparate treatment claim (Count I) on her allegations concerning late 2011" because any conduct before February 2012 was not exhausted). In addition, Ms. Doe repeatedly references purported discrimination before she was hired because she was subjected to an extensive security review conducted by the Office of Security before she could start. *See* Doe Dep. at 113:18–21 ("In the record it actually shows that even before I was hired, so pre-hire, the Office of Security had already had concerns about my race and national origin, and because of that they actually opposed me even being hired."); Pl.'s Opp'n at 6 ("Defendant's increased scrutiny of Plaintiff based on her race began before Defendant hired her."). Yet elsewhere, Ms. Doe places the starting point of the discrimination she experienced after she returned from her trip to Jamaica. *See id.* at 21 ("Plaintiff was subjected to unwelcome harassment starting just four months into her career . . . ."); *id.* at 22 ("Here, Defendant's harassment of Plaintiff was both severe and pervasive. It *began on November 2011* . . . . (emphasis added)). Indeed, Ms. Doe does not mention this pre-hiring discrimination anywhere in her hostile-work-environment argument, *id.* at 21–28, and the Court likely could not consider the pre-hiring conduct for any other claim because Ms. Doe does not appear to have exhausted claims regarding that conduct. *See Doe*, 2024 WL 864270, at *6. At any rate, as explained below in Part IV.B.1, because this pre-hiring security screening was conducted by the Office of Security, *see* Doe Dep. at 113:18–21, it would still fall within *Egan*'s bar.

*Egan* renders nonjusticiable any "claim based on an adverse employment action *resulting from an agency security clearance decision.*" *Ryan*, 168 F.3d at 523 (emphasis added).

But Ms. Doe also challenges the decisions that *led up to* the revocation of her security clearance—the decisions requiring Ms. Doe to sit for interviews and polygraphs, write a Statement of Allegiance, and report foreign contacts as well as the decision to initiate a Counterintelligence Review and Risk Assessment. This raises two questions, one simple and one more complex.

First, does *Egan*'s bar cover the investigation that precedes a security-clearance revocation? The D.C. Circuit has held that it does, subject to an important caveat discussed in Part IV.B *infra*. In *Rattigan v. Holder*, the D.C. Circuit reviewed a jury verdict in favor of a plaintiff who challenged the FBI's decision to "launch[ ] a security investigation," endangering his security clearance. 643 F.3d 975, 977 (D.C. Cir. 2011) ("*Rattigan I*"). The plaintiff challenged neither "the denial nor revocation of his security clearance nor the loss of employment resulting from such action" because the agency never terminated his security clearance and he remained employed at the agency. *Id.* at 981. Nevertheless, on appeal, the court vacated the jury's verdict because the case put the jury "in the position of reviewing the substance of discretionary Security Division decisions," including the "threshold decision by the Security Division to investigate" the plaintiff. *Id.* at 984. In other words, *Egan* covers decisions to conduct security-clearance investigations, not just the ultimate determination to revoke a security clearance.

The D.C. Circuit later vacated its opinion and reheard the appeal *en banc*. *See Rattigan v. Holder*, 689 F.3d 764, 765 (D.C. Cir. 2012) (en banc) ("*Rattigan II*"). But it expressly reinstated *Rattigan I* "to the extent [it was] consistent with" *Rattigan II*, and the jury's verdict therefore

remained vacated. *Id.* at 773. Because *Rattigan II* never analyzed the portion of *Rattigan I* discussed above—instead focusing entirely on narrowing an exception, discussed below in Part IV.B—that reasoning remains binding. *See id.* at 765. Accordingly, this Court cannot review employment claims directed at the decision to investigate Ms. Doe's continued eligibility for a security clearance. *See Palmieri v. United States*, 896 F.3d 579, 584–85 (D.C. Cir. 2018) (applying *Egan* to bar judicial review of government actions "investigating" and "gathering information about" the plaintiff in connection with his security clearance).

Second, do Ms. Doe's claims challenge the means rather than the ends of her security-clearance revocation? The D.C. Circuit has long distinguished between the "ends and means" of a security-clearance determination. *Nat'l Fed'n of Fed. Emps. v. Greenberg*, 983 F.2d 286, 290 (D.C. Cir. 1993). *Greenberg* involved a challenge to the propriety of three questions on a questionnaire designed to help "reinvestigate" the Department of Defense's "civilian employees holding security clearances." *Id.* at 287. The court held the plaintiffs' claims were justiciable, although it also held that the claims likely failed on the merits and therefore vacated the district court's preliminary injunction. *See id.* at 291, 295. On justiciability, the court explained that, unlike *Egan*, the plaintiffs' claims did not concern "discretionary judgments regarding a particular employee's security clearance." *Id.* at 290. They involved only "the *methods* used to gather information on which such judgments presumably will be based." *Id.* (emphasis added). Even assuming the ultimate decision to revoke a security clearance was unreviewable, "the judiciary still may properly scrutinize *the manner* in which th[at] objective is to be achieved." *Id.* (emphasis added). That description could, at least superficially, be applied to Ms. Doe's challenges to the interviews, polygraph examinations, and other investigative techniques in this case. *See id.*

The problem with construing Ms. Doe's claims as challenges to the means of the Office of Security's investigation is that she does not challenge the propriety of the procedures themselves. Ms. Doe does not argue that polygraph examinations, pledges of allegiance, interviews, or any of the other investigation techniques used are impermissible means of assessing whether an employee may possess classified information. If she did, that would potentially put her claims in line with the challenges to specific investigation questions at issue in *Greenberg*. *Id.* at 287. Nor does Ms. Doe argue that she was afforded too little process—except for her objections to the reconsideration process, which the Court previously dismissed. *See Doe v. Austin*, No. CV 22-3474 (RC), 2024 WL 864270, at *12–13 (D.D.C. Feb. 29, 2024) (dismissing claim challenging the reconsideration process because the "claim [was] simply too lacking in detail to survive a motion to dismiss"); *cf., e.g.*, *Zaid v. Exec. Off. of President*, 815 F. Supp. 3d 113, 122–23 (D.D.C. 2025) (concluding that *Egan* did not bar a claim that the revocation of a security clearance was improper because the government revoked the security clearance "without any of the process it usually affords").

Instead, Ms. Doe argues (and it is an essential element of her discrimination and retaliation claims) that the procedures, while not inherently unlawful, were unlawful *because they came from an impermissible motive*; and it is that inquiry which the D.C. Circuit has held lies beyond this Court's purview. *See Ryan*, 168 F.3d at 524. In *Ryan*, the D.C. Circuit held that *Egan* barred the discrimination claims of four plaintiffs who challenged the denial of their applications for security clearances and the concomitant withdrawal of their federal employment offers. *See id.* at 521, 523. The court explained that to analyze such discrimination claims it would be "necessary to apply the burden allocation scheme first announced in" *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Ryan*, 168 F.3d at 523–24. Under that three-step

framework, (1) an employee must establish a prima facie case of racial discrimination, then (2) the employer may respond by articulating a legitimate, nondiscriminatory reason for the challenged employment action, at which point (3) the burden falls on the employee to show that the explanation was a pretext for discrimination. *See Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113–14 (D.C. Cir. 2016).

The problem, according to the *Ryan* court, was that "a court cannot clear the second step of *McDonnell Douglas* without running smack up against *Egan*." *Ryan*, 168 F.3d at 524. That is because a plaintiff cannot "challenge the proffered reason's authenticity without also challenging its validity." *Id.*

> The more valid a reason appears upon evaluation, the less likely a court will be to find that reason pretextual; the converse is also true. Even when the court faces independent evidence of a discriminatory motive, it is still necessary to weigh the validity of the defendant's proffered reasons when deciding if they are pretextual. In short, the merit of such decisions simply cannot be wholly divorced from a determination of whether they are legitimate or pretextual.

*Id.* (quoting *Brazil v. U.S. Dep't of Navy*, 66 F.3d 193, 197 (9th Cir. 1995)).

Here, as in *Ryan*, each of Ms. Doe's retaliation and discrimination claims requires a factfinder to determine whether the agency acted out of an unlawful motivation or based on security concerns. *See Baloch v. Kempthorne*, 550 F.3d 1191, 1196, 1198 (D.C. Cir. 2008) (Kavanaugh, J.) (discrimination and retaliation claims require proof that discriminatory or retaliatory animus motivated the challenged action). Because the Secretary has offered a neutral explanation for the DIA's conduct as to each claim—that the agency acted out of a security concern based on Ms. Doe's false statements in interviews, among other security concerns—it would be difficult to determine whether this nondiscriminatory explanation was the true motivation behind the agency's actions without forming some view on the security rationale's strength and validity. *See* Pl.'s Ex. 26 at 186–87 (listing reasons for security-clearance

suspension); *cf. DeJesus v. WP Co.*, 841 F.3d 527, 534 (D.C. Cir. 2016) (holding that a jury could reject an employer's neutral explanation for its employment decision because it was "unreasonable" and therefore "provoke[s] suspicion of pretext").

Ms. Doe's own brief illustrates the point. She repeatedly defends her claims by attacking the validity of the Secretary's security justifications. She argues that she provided explanations for her false statements that should have assuaged Ms. Lindenaur's security concerns, and she disputes whether the reports that, at least in part, motivated Ms. Lindenaur's investigation were "credible." Pl.'s Opp'n at 22–23; *see also id.* at 32; *id.* at 38–39. She also criticizes the Office of Security's Counterintelligence Review and Risk Assessment for "ignor[ing] the fact that [she] passed multiple polygraph examinations." *Id.* at 16.

In other words, she invites the Court, and presumably eventually a jury, to second-guess the agency's security concerns based on the Court's own evaluation of whether those concerns were reasonable. The Court cannot accept that invitation. *See Rattigan II*, 689 F.3d at 769 (holding that "permitting jurors to infer pretext based on their own judgment that the information reported was either unlikely to prove true or raised insufficiently weighty security concerns" would run afoul of *Egan*). Ms. Doe's retaliation and discrimination claims therefore fail.[7]

---

[7] Ms. Doe could not salvage these claims by arguing that they challenge the collateral consequences of the security-clearance investigation rather than the investigation itself. In addition to the investigation and security-clearance decision, Ms. Doe also challenges the cancellation of her scheduled deployment and her placement on administrative leave, which occurred before the agency formally revoked her security clearance. *See* Pl.'s Opp'n at 21. But analyzing whether those actions came from an unlawful motivation would still require prying into the validity of the government's security rationale. Ms. Doe insists that she was not told at the time the reason for the cancellation of her deployment and that she believes it was because of her race and national origin. Doe Dep. at 111:3–25, 112:9–21. But, as Special Agent John L. May explained, "[r]outinely, if an employee is under investigation, they cannot deploy." Def.'s Ex. 10 at 97. Ms. Doe does not dispute this policy or that she was under investigation at the time. In fact, she appears to concede that the Office of Security connected the cancellation of her deployment to her polygraph examination—although she views it as a mere pretext. Doe Dep. at

**B.**

Although Ms. Doe's claims challenge the substantive basis of her employer's determinations about whether she should possess a security clearance and the investigation leading up to that decision, the analysis does not end there. Ms. Doe argues that her claims fit within an exception that the D.C. Circuit carved out in *Rattigan II*, *see* Pl.'s Opp'n at 34, 39, which implicates the caveat that the Court referenced earlier.

In *Rattigan II*, the court held that *Egan* did not bar discrimination claims based on knowingly false reports by government employees outside the office responsible for making security-clearance decisions. *See Rattigan II,* 689 F.3d at 768, 770. That conclusion relied on two determinations. First, the court held that "*Egan*'s absolute bar on judicial review covers only security clearance-related decisions made by trained Security Division personnel and does not preclude all review of decisions by other [agency] employees who merely report security concerns." *Id.* at 768. As the Circuit saw it, *Egan* protected only decisions "made by those with the necessary expertise in protecting classified information," not all agency employees. *Id.* at 767 (quoting *Egan*, 484 U.S. at 529). Second, although not absolutely protected, the court held that an employee could challenge reports made by their nonexpert colleagues only if the reports were "*knowingly false*." *Id.* at 770. The court feared that a lower standard would have a "chilling effect on reporting" by agency employees, who were otherwise "encouraged and expected to report any information that raises doubts as to whether another employee's continued

112:1–11; *see also* Pl.'s Opp'n at 4 (tying the cancellation of Ms. Doe's deployment, the revocation of her security clearance, her placement on administrative leave, and the loss of her employment to the "baseless" Counterintelligence Review and Risk Assessment). Because Ms. Doe herself ties these collateral consequences to the security-clearance investigation, her challenges to them impermissibly invite the factfinder to second-guess the government's security rationale and are therefore nonjusticiable.

eligibility for access to classified information is clearly consistent with the national security." *Id.* at 768–70 (quoting Exec. Order No. 12,968 § 6.2(b), 60 Fed. Reg. 40245, 40253 (1995)).

To determine whether Ms. Doe's claims fit within *Rattigan II*'s exception, the Court must address (1) whether any of the actions that Ms. Doe challenges were made by agency members outside the designated security branch and (2) if so, whether those actions involved knowingly false reports. The parties have not expressly identified the designated security branch, but it appears to be undisputed that for the DIA, the designated security branch includes the Office of Security, where Ms. Lindenauer worked. *See, e.g.*, Pl.'s Exs. at 47 (explaining that Ms. Lindenauer worked for the "Counterintelligence and Security Office" and that "her job required her to conduct counterintelligence investigations" and "resolve questionable activity involving security matters").

**1.**

Most of the actions Ms. Doe challenges involve the Office of Security. That office, through Ms. Lindenauer, initiated the interviews, polygraph examinations, and other investigative steps. *See* Pl.'s Statement Facts ¶¶ 10–11, 18–37, 47–55, 58–64 (detailing investigative measures involving Ms. Lindenauer). The office also conducted the Counterintelligence Review and Risk Assessment. *See id.* ¶ 83 (admitting that "the Security Office issued a CIRA regarding Plaintiff"). Similarly, the decision to cancel Ms. Doe's deployment to Afghanistan was made, at least in part, by the Office of Security. Def.'s Ex. 10 at 97 (responding to the allegation that the Office of Security canceled Ms. Doe's deployment by explaining that the decision "is not *totally* made by the Office of Security" but noting that it was related to the "investigation" conducted by the Office of Security (emphasis added)); *see also*

Pl.'s Statement Facts ¶ 87 ("Plaintiff learned that the Security Office canceled her deployment . . . ."). *Rattigan II* therefore does not save these parts of Ms. Doe's claims.

A few of the challenged actions, however, came from outside the Office of Security. Most notably, Ms. Doe challenges Deputy Director Shedd's directive to the Office of Security to readjudicate Ms. Doe's security clearance. *See* Pl.'s Statement Facts ¶ 80; *see also* Pl.'s Opp'n at 27. Ms. Doe also identifies reports by two other agency employees outside the Office of Security that contributed to Ms. Lindenauer's continued investigation. *See* Def.'s Statement Facts ¶¶ 11–15. The Court will address the reports by agency employees in the next section. For now, however, the Court concludes that *Egan* shields Deputy Director Shedd's directive.

Deputy Director Shedd does not fall neatly within *Rattigan II*'s dichotomy. He is not an employee within the Office of Security and therefore is not necessarily analogous to the "trained Security Division personnel" contemplated by *Rattigan II*. 689 F.3d at 768. But he is not just another "non-expert employee" deciding to "refer a colleague for a potential security clearance investigation" either—the other end of the dichotomy in *Rattigan II*. *Id.* at 767 (quotation omitted). Deputy Director Shedd, the parties appear to agree, held sway over the Office of Security. After all, he apparently had the authority to "direct" the Office of Security to take action. Def.'s Statement Facts ¶ 18. Ms. Doe even describes it as Deputy Director Shedd "direct[ing] *his* Security Office," Pl.'s Statement Facts ¶ 81 (emphasis added), presumably because he was Deputy Director of the DIA, and the Office of Security sits within that agency, Def.'s Statement Facts ¶¶ 2, 4.

Although *Rattigan II* sheds little light on how to treat Deputy Director Shedd, other cases provide guidance. *Egan* itself noted that "there is a reasonable basis for the view that an *agency head* who must bear the responsibility for the protection of classified information committed to

his custody should have the final say in deciding whether to repose his trust in an employee who has access to such information." 484 U.S. at 529 (emphasis added) (quoting *Cole v. Young*, 351 U.S. 536, 546 (1988)). This language suggests that Deputy Director Shedd, who presumably bore the responsibility of protecting classified information within the DIA, should receive *Egan*'s protection.

Cutting against that current, however, is a chorus of recent decisions in this district concluding that the President's decision to suspend the security clearances of lawyers at designated law firms was subject to judicial review and not protected by *Egan*. *See, e.g.*, *Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105, 141–44 (D.D.C. 2025); *Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 101 (D.D.C. 2025); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 3d 127, 148 (D.D.C. 2025); *Susman Godfrey LLP v. Exec. Off. of President*, 789 F. Supp. 3d 15, 38 (D.D.C. 2025). These decisions distinguished *Egan* and its progeny because, unlike in *Egan*, the law-firm plaintiffs challenged a "general policy rather than individual determinations" made by "security clearance experts." *Perkins Coie*, 783 F. Supp. 3d at 143; *see Jenner & Block*, 784 F. Supp. 3d at 101 (similar); *Wilmer*, 784 F. Supp. 3d at 148 (similar); *Susman Godfrey*, 789 F. Supp. 3d at 38 (similar). Although not binding, this line of cases suggests that courts may review an agency head's, or at least the President's, decision when that decision is unguided by expert judgment.

Considering these cases together, the Court concludes that here, because security professionals' investigations and assessments bookended Deputy Director Shedd's decision, his decision is unreviewable. The Office of Security began investigating Ms. Doe long before Deputy Director Shedd's involvement. *See* Def.'s Ex. 3 at 43 (explaining that the investigation began in November 2011). That investigation culminated in an Office of Security report on June

21, 2012, detailing the evidence the office's investigation had unearthed. *See id.* Deputy Director Shedd did not order the Office of Security to conduct a Counterintelligence Review and Risk Assessment until a few weeks later. *See* Pl.'s Statement Facts ¶ 81. As the Deputy Director explained, before authorizing a Counterintelligence Review and Risk Assessment, he would have "been briefed by the . . . Office of Security about their concerns with the subject." Def.'s Ex. 15 ¶ 4. Ms. Doe presents no evidence to contradict Deputy Director Shedd's knowledge of the Office of Security's concerns before he initiated the Counterintelligence Review and Risk Assessment. *See* Doe Dep. at 109:15–18 (Ms. Doe stating: "I do not know what Mr. Shedd reviewed before he initiated the counterintelligence risk assessment.").

Even then, Deputy Director Shedd's instruction did not require the termination of Ms. Doe's security clearance. That would follow only after the Office of Security completed the Counterintelligence Review and Risk Assessment, further infusing the judgment of security professionals into the process. *See* Pl.'s Ex. 25 (Counterintelligence Review and Risk Assessment dated July 5, 2012); Pl.'s Ex. 26 (notice of intent to revoke security clearance dated January 30, 2013). The Office of Security's expertise-laden investigation therefore undergirded Deputy Director Shedd's decision, which distinguishes this case from those finding blanket, pre-review decisions by the President to be reviewable. *Cf., e.g.*, *Perkins Coie*, 783 F. Supp. 3d at 143.

On these facts, it would be incongruous with *Egan* and its progeny to expose Deputy Director Shedd's decision to employment liability. Determining that liability would require untangling whether Deputy Director Shedd's decision was based on the security concerns—either using his own expertise or out of deference to the Office of Security's expertise—as opposed to an impermissible motive. That is the same determination the D.C. Circuit has

instructed courts not to delve into because courts and juries are ill-equipped to second-guess how weighty or important a security concern is. *See Ryan*, 168 F.3d at 524. Moreover, subjecting decisions by agency heads and deputies made after a report from the expert office to employment liability would simply incentivize agencies not to require those offices to seek approval from high-level officials before moving forward. That would result in fewer guardrails on arbitrary security-clearance removals.[8]

**2.**

Aside from Deputy Director Shedd, however, Ms. Doe draws the Court's attention to two reports from employees outside the Office of Security that contributed to Ms. Lindenaur's investigation. *See* Def.'s Statement Facts ¶¶ 11–15. These reports do not fall within "*Egan*'s absolute bar on judicial review." *Rattigan II,* 689 F.3d at 768. That leads to the second question raised by *Rattigan II*: whether these reports were knowingly false. *See id.* at 770. There is no evidence that they were.

The first report stated that Ms. Doe was "reviewing pictures of other [redacted] students on her desktop and typing notes on a separate window." Pl.'s Ex. 13 at 118. The report continues, after an extended redaction, that the reporter "initially dismissed" the conduct "as suspicious because [redacted] usually makes notes on everything class related and has an odd personality." *Id.* A subsequent interview with an employee, who appears to be the same reporting employee, indicates that Ms. Doe often stayed late in class and that the source's

[8] Even if the Court were wrong about treating Deputy Director Shedd's decision as akin to a decision by the Office of Security and therefore subject to "*Egan*'s absolute bar on judicial review," it does not necessarily follow that his decision would be reviewable. *Rattigan II*, 689 F.3d at 768. After all, *Rattigan II* itself severely limited judicial review of reports by even employees outside the relevant expert office. *See id.* at 770. There may be other appropriate limitations to review of a decision by a deputy director.

information was "second hand." *See* Pl.'s Ex. 10 at 101. A second report from a different employee explained that Ms. Doe was taking notes on fellow classmates and included a "list of names." Pl.'s Ex. 13 at 119. The employee explained that they "found it strange that [Ms. Doe] arrived with a group of around ten individuals[,] some of Asian decent [sic]." *Id.*

Ms. Doe identifies no evidence suggesting that either report was knowingly false. Ms. Doe argues that the first report was "not credible" and "confirms that [her] behavior was not suspicious." Pl.'s Opp'n at 38. She also argues that the second report exhibited racial bias because the employee found it "strange" that she would socialize with people of Asian descent. *Id.* These arguments are beside the point because they do not establish that any of the information reported was false, much less knowingly false. Indeed, Ms. Doe does not even deny the reported information. *See* Doe Dep. at 65:25–69:25 (Ms. Doe discussing the allegations in the reports without denying the underlying information); *see also id.* at 69:20–22 (Ms. Doe admitting that there were times when she reviewed photos of her classmates on her desktop); Pl.'s Ex. 9 at 70 (chronology created by Ms. Doe admitting that she stayed in class "later than most classmates" and created a separate "name roster" of her classmates).

What Ms. Doe quarrels with is not the *truth* of the reported information but the *conclusions* the employees, and Ms. Lindenaur, drew from the information—that her activity was suspicious. Even assuming arguendo that a court agreed, in its own judgment, that the reports provide little cause for suspicion, it would not matter. What counts as suspicious behavior in the context of protecting highly sensitive national-security information is precisely the determination that *Rattigan II* prevents courts from making. *See Rattigan II*, 689 F.3d at 769.

The whole point of the knowingly false standard is to prevent judges and juries from questioning "an employee's decision to report dubious or potentially irrelevant information." *Id.* at 768.[9]

Ms. Doe also claims that Deputy Director Shedd made a knowingly false report when he initiated the Counterintelligence Review and Risk Assessment. *See* Pl.'s Opp'n at 39–40. She argues that he had no evidence that she was a national-security risk at the time and therefore his referral was "based on a false premise." *Id.* at 40. As explained above, the Court finds that Deputy Director Shedd's decision to refer Ms. Doe for a Counterintelligence Review and Risk Assessment to be beyond the Court's purview. But even if it were not, Deputy Director Shedd's directive cannot be knowingly false because it was not a statement of information. It was an order to the Office of Security to conduct a review.

Because Ms. Doe does not identify any knowingly false reports, she finds no shelter under *Rattigan II*. Instead, *Egan* and its progeny bar her efforts to challenge the investigation leading up to the termination of her security clearance and the termination itself.

**C.**

The Court therefore grants the Secretary's motion for summary judgment as to Ms. Doe's discrimination and retaliation claims (Counts I and III). For similar reasons, the Court has concerns about whether Ms. Doe's remaining claim, her hostile-work-environment claim in Count II, is justiciable. But the Secretary has not made this argument, and Ms. Doe has had no opportunity to respond to it. *Compare* Def.'s Mot. at 17, 19, 23 (invoking *Egan* only for the retaliation and discrimination claims), *with id.* at 6–10 (addressing the hostile-work-environment

[9] Another complicating factor is that significant portions of the reports and the summaries of interviews with the employees who made the reports are redacted. *See* Pl.'s Ex. 13; Pl.'s Ex. 10 at 100–03. But the Court makes no assumptions that any of the redacted information would arouse suspicion, especially because, as explained above, the Court's judgment on that matter is irrelevant.

claim without mentioning *Egan*). The Court will therefore deny the Secretary's motion for summary judgment on the hostile-work-environment claim without prejudice so that the Secretary may file a renewed motion, if he wishes, addressing this point.

To be sure, the Secretary raises other grounds for summary judgment on Ms. Doe's hostile-work-environment claim. But the Court is unsure whether it would be appropriate to reach those merits arguments if it turns out that the claim is nonjusticiable. The D.C. Circuit has held that the nonjusticiability of security-clearance-related claims is "not a jurisdictional bar," *Oryszak v. Sullivan*, 576 F.3d 522, 524 (D.C. Cir. 2009), although the author of that opinion added that the argument still "may not be waived," *id.* at 527 (Ginsburg, J., concurring). But the D.C. Circuit has also analyzed justiciability under *Egan* and its progeny as an application of the political-question doctrine, *see Lee*, 120 F.4th at 888, and that doctrine, according to the D.C. Circuit, "is jurisdictional." *Al-Tamimi v. Adelson*, 916 F.3d 1, 8 (D.C. Cir. 2019). And, in any event, the D.C. Circuit has allowed defendants to raise the issue on the eve of trial, after the parties and the Court would have expended significant resources preparing for trial, so the Court would prefer to address it at summary judgment. *See Rattigan I*, 643 F.3d at 977 (considering the issue when, even though the "litigation had stretched on for five years," the government did not raise the issue until "the day before trial"). Faced with this uncertainty, prudence counsels letting the parties litigate the issue in a subsequent motion for summary judgment.

## V. CONCLUSION

For these reasons, the Court grants the Secretary's motion for summary judgment for Counts I and III but denies the motion without prejudice for Count II. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: November 12, 2026

RUDOLPH CONTRERAS
United States District Judge